1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
9                                  AT TACOMA
10

11   MARIA JIMENEZ, as Personal
     Representative of the Estate of JOSE          Case No.  C09-5363RJB
12   RAMIREZ JIMENEZ,

13                 Plaintiff,                      ORDER ON DEFENDANTS'
                                                   MOTION FOR SUMMARY
14          v.                                     JUDGMENT

15   CITY OF OLYMPIA; PAUL BAKALA
     and STACY BAKALA and the marital
16   community thereof; MIKE HOVDA
     and JANE DOE HOVDA and the marital
17   community thereof; CHUCK GASSETT
     and JANE DOE GASSETT and the marital
18   community thereof; CITY OF LACEY;
     JOHN DOE AALBERS and JANE DOE
19   AALBERS and the marital community
     thereof; and JOHN DOE SAPINOSO and
20   JANE DOE SAPINOSO and the marital
     community thereof,
21
                   Defendant.
22

23

24          This matter comes before the court on Defendants' Motion for Summary Judgment. Dkt. 12.

25   The court has considered the pleadings filed in support of and in opposition to the motion and the file

26   herein.

27                                    RELEVANT FACTS

28          At about 12:30 a.m. on November 15, 2008, Olympia Police Officers, including defendants

ORDER
Page - 1

1    Chuck Gassett, Mike Hovda and Paul Bakala (Olympia Police Officers), responded to State Avenue

2    and Wilson Street in Olympia.  Dkt. 13-3, at 3.  They found Joshua Eden lying on the sidewalk,

3    suffering from a gunshot wound in his leg.  Dkt. 13-3, at 4 and 19.  Witnesses at the scene reported

4    that Mr. Eden and a friend were crossing the street when a black Honda Del Sol approached; the Del

5    Sol stopped; Mr. Eden said something; the driver of the Del Sol shot Mr. Eden and drove away. Dkt.

6    13-3, at 6, and 19-20.  A friend of the victim told Officer Bakala that the shooter was the driver of a

7    blue or black Del Sol.  Dkt. 26, Exh. B, at 54.  The friend said he "didn't get a real clear look at him,

8    but he did remember he was dark skinned.  He thought he was either a black or Hispanic male."  Dkt.

9    26, Exh. B, at 54. Officer Gassett testified at his deposition that Officer Hovda and other officers

10   described the shooter as a young, white male, dark skin, short dark hair, twenties to thirties.  Dkt. 26,

11   Exh C. At 84. Officer Hovda stated that some witnesses saw one male in the vehicle; some saw two.

12   Dkt. 26, Exh. D, at 71. Officer Hovda found one bullet shell casing near the victim.  Dkt. 13-3, at 31.

13   While officers were at the scene, the dispatch center checked the state registry and radioed back that

14   there were 109 Del Sol automobiles registered statewide, 60 of them black; two Del Sols were

15   registered in Thurston County, one green and one red.  Dkt. 26, Exh. C, at 21.

16           At about 5:45 a.m., while driving westbound on Fourth Avenue, Officer Hovda observed

17   what appeared to be a black Honda Del Sol with two occupants stopped by the front of the

18   convenience store at the Shell service station located just east of the Fourth Avenue and Pacific

19   Avenue intersection, within a few blocks of where the Eden shooting had occurred. Dkt. 13-3, at 33.

20   Officer Hovda entered the Shell station lot, drove by the Del Sol, and then stopped on nearby

21   Chambers Street.  Dkt. 13-3, at 33.  During this process, Officer Hovda confirmed that the vehicle

22   was a Honda Del Sol, and took the license number. Dkt. 13-3, at 33.  Officer Hovda saw only a driver

23   in the car but it appeared that the driver was waiting for someone to come out of the Shell store.  Dkt.

24   13-3, at 34.     Officer Hovda radioed for backup assistance from Officers Bakala and Gassett.  As he

25   waited, the Del Sol backed up and pulled in front of the convenience store, facing South toward

26   Pacific, with the passenger door next to the entrance of the store.  Officer Hovda testified in his

27   deposition, as follows:

28           From where I was at, I could see he got out of the driver's door and appeared very nervous to
             me, almost fidgety, a lot of movement.  He kept getting in the vehicle, out of the vehicle, kept

> looking at me, looking at me, looking at the store.  He seemed very nervous like he was wanting someone to hurry up and then also just the indication that I got was that he was very nervous about I was there.

Dkt. 13-3, at 34.  Officer Hovda observed that the driver was a male with "slightly darker skin."  Dkt. 13-3, at 34.

Officers Hovda and Bakala agreed via radio to stop the driver of the Del Sol at the Shell station.  Dkt. 26, Exh. D, at 83.  Officer Bakala entered the Shell station lot, and positioned his patrol car behind the Del Sol, and put his emergency lights on.  Dkt. 26, Exh. D, at 84.  Officer Hovda followed, stopping a little behind Officer Bakala.  As he moved in, Officer Bakala saw a female come out of the convenience store and get into the passenger seat of the Del Sol.  Officer Bakala testified in his deposition, as follows:

> Q.  So, what happened after you pulled in behind the del Sol?
>
> A.  I exited my patrol car, stood behind the door, because I noticed as we were pulling in, the driver was really nervous, starting to look around and had some body language that he was pretty nervous about our presence, and it didn't feel right, and when you get that feeling, and just by his actions, the way he was looking past me and the totality of everything, I truly believed that this was probably going to be the vehicle.  So I stayed back behind my door, drew my firearm, based on the fact that I believed this was an armed suspect that had just shot somebody.  I didn't point it at him, just held it in a low ready position.  And I attempted to make contact with the driver by–either I started to say something or was going to say something and that's when the car just suddenly took off.
>
> Q.  Okay.  And what happened next?
>
> A.  Officer Hovda had pulled up in a position where I was behind the vehicle and Officer Hovda was kind of off my quarter panel, so it was clear that this driver knew that we were obviously police officers.  He took off at a high rate of speed out the entrance/exit on the south side of the parking lot and immediately took a left heading eastbound on Pacific.

Dkt. 13-3, at 24.

Officer Gassett was in the Fourth Avenue and Pacific intersection when he saw the Del Sol take off from the Shell station and skid coming onto Pacific.  Dkt. 13-3, at 8.  He moved in behind the Del Sol with his overhead lights and siren activated.  Dkt. 13-3, at 9.  The Del Sol did not stop. Dkt. 13-3, at 9. A high speed pursuit ensured, going east on Pacific. Dkt. 13-3, at 9.  As the Del Sol turned out onto Golf Club Road, it struck the barrier in the roundabout, then turned East onto 26th Avenue, and then turned South onto College Street. Dkt. 13-3, at 9.  Officers Bakala and Hovda followed. Dkt. 13-3, at 8.  Just after the Del Sol entered College Street, Officer Gassett stopped the Del Sol by swinging his vehicle around and striking the left rear side with the front of his patrol car.

ORDER
Page - 3

Dkt. 13-3, at 9.

Officer Gassett got out of his patrol car and stood behind the driver's side door.  Dkt. 13-3, at 11.  Officer Gassett was behind and to the left of the driver's side of the Del Sol.  Dkt. 13-3, at 11. Officer Bakala got out of his patrol car, moved toward Officer Gassett's patrol car, opened the right front passenger door of Officer Gassett's patrol car, and stood behind it. Dkt. 13-3, at 11. Officer Hovda positioned himself a few feet to Officer Bakala's right; Officer Hovda was unprotected behind the Del Sol.  Dkt. 13-3, at 11. All three officers had their guns drawn.  An officer from the town of Lacey was positioned off to the left of Officer Bakala.  Dkt. 13-3, at 11.

Officer Gassett ordered the driver to not get out of the car, to turn the car off, and to put his hands in sight. Dkt. 13-3, at 10.  Officer Gassett stated in his deposition that  "[h]e wasn't complying, he was yelling, he was very animated with his movements, very jerky, very excited."  Dkt. 13-3, at 11.  Officer Gassett stated that "[h]e was moving his arms around in frantic motions, very jerky, not making any sense.  His head was jerking left and right, his body was moving a lot."  Dkt. 13-3, at 11. Officer Gassett stated that the driver said things like "[l]eave me alone;" "I didn't do anything;" "[w]hat do you want?"  Dkt. 13-3, at 11.

Officer Bakala described the driver of the Del Sol as "very upset, moving around.  The guy just seemed to be a little bit out of it."  Dkt. 13-3, at 26.  Officer Bakala stated that the driver seemed "really agitated and really upset."  Dkt. 13-3, at 26.  Officer Bakala said that the driver yelled "What did I do, what did I do?"  Dkt. 13-3, at 26.

Officer Hovda testified that the driver kept yelling "[w]hat did I do, what did I do?"  Dkt. 13-3, at 35.

Officer Hovda testified that "I kept saying, 'Show your hands, show your hands'".  Dkt. 13-3, at 35.  Officer Bakala testified that the officers were shouting at the driver "repeatedly '[p]ut your hands up, put your hands up'. This is ongoing, it's not just one command, this is ongoing."  Dkt. 13-3, at 26.

Officer Gassett testified at his deposition as follows:

Q     And then at some point you stopped being able to see both those hands?

A     Yes.  He started reaching down for something on his right side with his left hand, reaching across his body.

Q      Did you see what he was reaching for?

A      I couldn't see.

Q      What did you believe he was reaching for?

A      A gun.

Q      Did you see a gun at any point before you fired?

A      No.

Q      Did you see a gun at any point?

A      I can't say for sure.  I helped take him out of the car.  I know where the gun was.  I probably saw the gun.  I can't definitely say I saw a gun at any point.

Q      Okay.  Do you remember seeing a gun at any point, you know, at any point, like ever?

A      In the photographs of the scene, et cetera, yes.

Q      Why did you believe that he was reaching for a gun if you didn't see a gun?

A      Based on his actions, based on the point that I felt he shot somebody five hours earlier, he wasn't giving up, he was reaching for something, he was animated, he was not obeying orders and I felt he was reaching for a weapon.

Dkt. 13-3, at 15.

Officer Gassett testified that, during this time, he heard a female passenger shout "'Don't.

Stop.'  And then I heard her say either 'Don't do it' or Don't do that,' and I'm not sure which it was."

Dkt. 13-3, at 13.   Officer Bakala testified as follows:

We continued to shout those orders and he continued to ignore them.  I remember at one point he's reaching over and doing this, at some point I remember the female passenger reaching over and turning towards him, and I can just see him turning this way and just see the top of his arm, she is grabbing his arms, holding onto his arms and hands and yelling, "Don't do it, don't do it."

Dkt. 13-3, at 26.   Officer Hovda testified as follows:

Eventually he gave up with what he was doing there because the female was fighting him and telling him, "Don't do that" or "Don't do it."  I could hear her yelling and screaming, and she finally took ahold of his face, and that's when he stopped doing whatever he was doing in the center console, turned and took hold of the steering wheel of the car and then I could see both hands.

Dkt. 13-3, at 35.

Officer Bakala testified as to his view of what was happening:

Q      At this point did you feel like there was an immediate threat of death or serious bodily injury to you or others?

1    A    Absolutely I did.

2    Q    And that was based on him acting the way he was acting, the totality of the circumstances?

3

4    A    Yea, the totality of the circumstances is that this is clearly a vehicle that was involved in the shooting, in my mind, based on everything, and now I've got a person that I believe is armed and has shot someone senselessly earlier in the day, earlier in the night, and now he's reaching in the center console and he doesn't want to do what we are instructing him to do. I believe at that point it was a matter of time before he was going to be able to produce a handgun and start shooting at us.

5

6

7    Q    Did you use deadly force upon him at this point?

8    A    No.

9    Q    Why not?

10    A    Because I'm trying–believe me, it's crossing my mind, and it's not something that you want to happen that anybody can take real lightly.

11

12    Q    Okay.

13    A    I've been there before and I've had to make these kind of decisions before and it's not something you want to happen, so you try–you are constantly evaluating what's doing on.

14

15    Q    Okay. Did you believe deadly force would have been authorized at this point?

16    A    Yes.

17 Dkt. 13-3, at 26.

Officer Hovda testified as to what happened next:

18

19    A    He ended up starting the vehicle and putting it in–taking ahold of the shifter, and I'm thinking he's going to drive forward to try to escape. I have my gun drawn. I have already told him that, "If you don't show me your hands, I'm going to shoot you" because I just felt that there was a gun there. And instead of putting it in a forward gear, I look down and I can see the white reverse lights come on, meaning that he had put it in reverse and I heard the engine accelerate.

20

21

22    Q    And what happened next?

23    A    My brain started going into overload. I am a couple feet behind this vehicle, I'm trying to look for an avenue of escape, so I move to the right and I run into a fence, a wooden fence, so I can't get out of the path that way, so I think I'm going to move forward, can't go forward, because all he's got to do is turn to the right and shoot me, so I move back over behind the vehicle where Officer Bakala is giving orders, we are all giving orders, and I think about, well, maybe I can run, but then there's the width on the sidewalk was about the width of his car, there's no place to run behind, and so I turned to fire my weapon and I started to pull on the trigger and he put it in a  forward gear.

24

25

26

27

28    Q    And when he put it in forward gear, you decided not to shoot?

1    A    Correct.

2    Q    You said that the rear lights came on like he was going to go in reverse and the engine
3         revved.  Did the car move?

4    A    It was shuttering, yes.

5    Q    Did it actually move back toward you?

6    A    You know, I could not tell you if it actually moved.  I can remember like it's pushing
          against the patrol car.  I think it moved the patrol car on that time or the next time, but
          I'm not sure.

7    Q    After he put the car back in forward and you decided not to shoot, did you move from
8         where you were located?

9    A    No.  I was still in that same general area.  There was no other place to move.

10   Q    Okay.  You say there was no other place to move. What do you mean by that?

11   A    I already tried moving to the right and ran into the fence, couldn't move forward
          because he'd have a better angle of a shot.  Can't go back because he could still back
12        over me.  And the fact that now it's pretty clear that this person is the one that
          committed the crime of shooting this person while walking across to the sidewalk, I
13        did not feel we could let him go.

14   Q    You saw where Officer Gassett was located, right?

15   A    Correct.

16   Q    In terms of not being hit by the del Sol, was he in a better position than you or about
          the same?

17
     A    Well, he wouldn't have been hit by the del Sol, but he could have been hit by his own
18        patrol car if the del Sol had pushed his patrol car.  So he had the cover of his patrol
          car.
19
     Q    And that cover was–what impact, if anything, did it have on the risk that Officer
20        Gassett would be harmed?

21   A    It would be less risk than myself or Officer Bakala if we are only talking impact of the
          vehicle, of the vehicles.
22
     Q    If we are talking about the overall risk?
23
     A    The overall risk is probably pretty close to the same because if he came out with a
24        handgun, he could have shot at any one of us.

25   Q    So the risk of being shot was about the same?

26   A    I would say so.

27   Q    But the risk of being hit by the del Sol, by the car, was less?

28   A    Correct.

1  Q  After he put the car into forward, what happened next?

2  A  I heard the engine revving again like he was trying to drive away, and I started
3     thinking that maybe this female was also trying to get him to stop doing what he was
      doing still, so, I was thinking that maybe she wasn't a willing participant of this whole
      thing, so then I started thinking, well, how I can get her out of the vehicle, and I
4     started giving her orders to get out of the vehicle.

5  Q  And what happened next?

6  A  Exactly in what order it occurred, I don't know, but she ended up getting out of the
      vehicle and the suspect put it in reverse again and I saw the vehicle starting to lunge
7     even further than it did before back towards Officer Bakala and I.

8  Q  Okay.  What happened next?

9  A  Well, you could see the intensity in him inside the car when he shifted gears, when he
      was trying to steer, he was very–it appeared to me he was very intent on doing what
10     he needed to do, and when he put it in reverse the second time, you could definitely
      hear the tires spinning.  I remember hearing a gunshot to my left for whatever reason, I
11     don't know, my vision, what have you, I knew what Officer Gassett was doing, and he
12     was firing a round into the left front tire.

      This vehicle is still coming back at me, or it looks like it's going to come back at me,
13     and I see the driver then reach quickly toward the left center console again where they
      had been fighting before, and I felt that I had to fire and stop this before one of us got
14     hurt, so I fired my weapon.

15  Q  You said you weren't sure about the sequence.  Did you make the decision to fire your
      weapon after he had reached toward the center console again?
16
17  A  I'm not sure about the sequence of when the female got out of the car, whether she
      was in the process of getting out of the car at the time I fired my weapon, whether she
18     got out before or just after.  I believe she got out just before I fired my weapon.  But
      the sequence for firing the weapon was the car was in reverse, it was lunging, he
19     reached to his right with his left hand, which was not a normal movement in my
      opinion, and he was going back to that area where she was telling him don't do that,
20     so, there was no doubt in my mind that at that point he was reaching for a gun, and I
      fired.

21 Dkt. 13-3, at 35-36.  Officer Hovda testified that he shot because he thought the driver was going to

22 run over him or that the driver was reaching for a gun to shoot him.  Dkt. 13-3, at 37.

23    Officer Gassett and Officer Bakala each fired two shots at the driver at about the same time as

24 Officer Hovda did.  Dkt. 26, Exh. C, at 81-82; Dkt. 26, Exh. C, at 104.

25    Officer Gassett testified that, when the driver put the car in reverse, he saw Officer Hovda to

26 the right of Officer Bakala, unprotected behind the police car; and that he saw a Lacey police officer

27 to Officer Gassett's left.  Dkt. 13-3, at 12.  Officer Gassett testified that the Del Sol moved a couple

28 of inches in reverse, and the door frame of the patrol car bumped Officer Gassett's shin bone.  Dkt.

1    13-3, at 12.  Officer Gassett testified that he decided to shoot after he concluded that the driver was

2    trying to "run over my partners."  Dkt. 13-3, at 14.

3        Officer Bakala testified that the car lurched forward, then back, a couple of times; and that the

4    second time, it started to come back to the curb.  Dkt. 13-3, at 27.  "[Y]ou can see he is trying to

5    build momentum to free himself."  Dkt. 13-3, at 27.  "[E]ither he is trying to free the vehicle or he is

6    trying to–maybe he is trying to eliminate Officer Hovda or I, but I will tell you that when that vehicle

7    popped up on the curb, the two of us were sitting ducks at that point."  Dkt. 13-3, at 27.  Officer

8    Hovda stated that he thought he was at high risk of being hit by the Del Sol.  Dkt. 13-3, at 27.

9    Officer Bakala stated that he believed that it was his duty to protect the community; that he believed

10   the driver of the vehicle was a danger to the community; and that it was his duty to take that person

11   into custody.  Dkt. 13-3, at 27.  Officer Bakala testified that the driver was in control of the scene,

12   when the driver refused to comply with the officers' requests; and that the driver's actions in trying

13   to acquire a handgun and trying to back into the officers and free himself created a situation in which

14   the officers did not have the ability to use any other options.  Dkt. 13-3, at 28.

15       Lacey police officer Roland Sapinoso was present during the incident and described his role

16   in the incident.  Officer Sapinoso testified that the driver of the Del Sol was accelerating, trying to get

17   away.  Dkt. 26, Exh. E, Deposition at 62. Officer Sapinoso went to his vehicle to get stop sticks (a

18   device used to flatten tires), but as he was heading back from his car with the stop sticks, he heard the

19   shots fired.  Dkt. 26, Exh. E, Deposition at 65;  Dkt. 13-3, at 12.

20       The driver of the Del Sol was Jose Ramirez Jimenez.  Mr. Jiminez died from his injuries.

21       This civil case was filed on June 18, 2009.  Dkt. 1.  On June 23, 2009, an amended complaint

22   was filed.  Dkt. 5. Plaintiff Maria Jimenez, as Personal Representative of the Estate of Jose Ramirez

23   Jimenez, contends that Mr. Jimenez died as a result of injuries sustained when police officers pinned

24   Mr. Jimenez' vehicle to the curb and fired multiple shots from a firearm or firearms.  Dkt. 5., at 5.

25   Ms. Jimenez has stated claims against Defendants City of Olympia, Paul Bakala and Stacy Bakala,

26   Mike Hovda and Jane Doe Hovda, Chuck Gassett and Janet Doe Gassett, the City of Lacey, John Doe

27   Aalbers and Jane Doe Aalbers, and John Doe Sapinoso and Jane Doe Sapinoso for violation of Mr.

28   Jimenez' rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution; and

1   state law claims for negligence/wrongful death, battery/wrongful death, negligence/wrongful death.

2   Dkt. 5.

3   <u>MOTION FOR SUMMARY JUDGMENT</u>

4        On June 24, 2010, defendants filed a motion for summary judgment, contending that (1) the

5   Olympia Police Officers (defendants Bakala, Hovda, and Gassett) are entitled to qualified immunity

6   for the Fourth Amendment excessive force claim; (2) the Fourteenth Amendment Due Process claim

7   must be analyzed under the appropriate standard for the Fourth Amendment, and is not cognizable as

8   a separate claim; (3) plaintiff has not shown the elements required for a claim of municipal liability

9   against the City of Olympia; (4) the state law claims for battery against officers Bakala, Hovda, and

10   Gassett should be dismissed because there was no excessive force; (5) the evidence does not support

11   a claim for negligence against officers Bakala, Hovda, and Gassett; (6) the public duty doctrine bars

12   the negligence claim against the City of Olympia; and (7) there is no basis for liability against the

13   City of Lacey police officers (defendants Aalbers and Sapinoso) or the City of Lacey.  Dkt. 12.

14        On July 15, 2010, plaintiff filed a response. Dkt. 25.  Plaintiff moves to strike evidence and

15   statements regarding things that occurred after the Olympia police officers shot Mr. Jimenez.  Dkt.

16   25, at 1-4.   Plaintiff also requests dismissal of the claims against the City of Lacy and Lacey police

17   officers Aalbers and Sapinoso, pursuant to Fed.R.Civ.P. 41(a).  Plaintiff affirms that she is not

18   making a substantive due process claim.   In addressing the merits of defendants' motion, plaintiff

19   contends that (1) Officers Bakala, Gassett (Olympia police officers) are not entitled to qualified

20   immunity because their initial attempt to detain the driver of the Del Sol at the Shell station was

21   unreasonable; and the force used to effectuate the seizure at the scene of the shooting was excessive;

22   (2) the policy of the City of Olympia is that officers generally use more force than those with whom

23   the officers interact; (3) the battery claim against the Olympia police officers should proceed because

24   the initial attempt to detain the driver of the Del Sol at the Shell station was unreasonable; and the

25   force used to effectuate the seizure at the scene of the shooting was excessive; and (4) plaintiff's

26   negligence claim should proceed because there is an issue of fact as to whether the Olympia police

27   officers and the City of Olympia breached their duty to Mr. Jimenez to arrest him without using

28   unnecessary deadly force. Dkt. 25.

1    On July 28, 2010, defendants filed a reply, contending that (1) the *Terry* stop, if what the

2    officers did at the Shell station could be considered a stop, was based upon reasonable suspicion; (2)

3    the balancing under *Graham v. Connor*, 490 U.S. 386, 396 (1989) establishes that Officers Bakala,

4    Gassett, and Hovda used reasonable, not excessive, force; (3) Officers Bakala, Gassett, and Hovda

5    are entitled to qualified immunity; (4) the City of Olympia does not have a policy that authorizes

6    excessive use of force; (5) because the Olympia police officers did not use excessive force, there is

7    no claim for battery; (6) the Olympia defendants are protected from a claim for negligence because

8    they are protected by the public duty doctrine and because the police officers had probable cause to

9    use deadly force; and (7) the Fourth Amendment claims against the City of Lacey officers (Officers

10   Aalbers and Sapinoso) and the City of Lacey should be dismissed with prejudice, not without

11   prejudice, as requested by plaintiff.  Dkt. 30.  Defendants concede, for the purposes of this motion,

12   that the evidence to which plaintiff objects is not necessary, with the exception of the photograph

13   taken by Joe West (Dkt. 13-2, at 2) that depicts the position of the Del Sol at the Shell station.  Dkt.

14   30, at 1-2.

15                              <u>SUMMARY JUDGMENT STANDARD</u>

16       Summary judgment is proper only if the pleadings, the discovery and disclosure materials on

17   file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

18   is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to

19   judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an

20   essential element of a claim in the case on which the nonmoving party has the burden of proof.

21   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where

22   the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.

23   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must

24   present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also*

25   Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient

26   evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

27   versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service*

28   *Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

1    The determination of the existence of a material fact is often a close question.  The court must

2    consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a

3    preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service*

4    *Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the

5    nonmoving party only when the facts specifically attested by that party contradict facts specifically

6    attested by the moving party.  The nonmoving party may not merely state that it will discredit the

7    moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the

8    claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.  Conclusory, non

9    specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan*

10   *v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

11                                          DISCUSSION

12   **1.  Motion to Strike**

13       In her response, plaintiff moves to strike evidence of Mr. Jimenez' body fluid level of

14   methamphetamine; evidence of the gun found in Mr. Jimenez' vehicle; testimony by Officer Gassett

15   that he probably saw the gun sometime after he discharged his weapon; and ballistic tests and chain

16   of custody of the gun retrieved from Mr. Jimenez' vehicle.  Dkt. 25, at 1-4.  Plaintiff contends that

17   this evidence is irrelevant because plaintiff's excessive force claim depends up whether the officers'

18   actions were objectively reasonable in light of the facts and circumstances confronting them, not

19   upon what occurred after they fired the shots the resulted in Mr. Jimenez' death.

20       Defendants concede, for the purposes of this motion, that the evidence to which plaintiff

21   objects is not necessary, with the exception of the photograph taken by Joe West (Dkt. 13-2, at 2) that

22   depicts the position of the Del Sol at the Shell station.  Dkt. 30, at 1-2.  Defendants contend that they

23   submitted this evidence in anticipation of arguments plaintiff could have made in her response to the

24   motion for summary judgment.  Because plaintiff did not make those arguments, defendants agree

25   that the evidence identified by plaintiff, with the exception of the photograph referred to above,

26   should not be considered in ruling on this motion for summary judgment.

27       Accordingly, the court should strike evidence of Mr. Jimenez' body fluid level of

28   methamphetamine; evidence of the gun found in Mr. Jimenez' vehicle; testimony by Officer Gassett

1    that he probably saw the gun sometime after he discharged his weapon; and ballistic tests and chain

2    of custody of the gun retrieved from Mr. Jimenez' vehicle.  The court should deny the motion to

3    strike the photograph taken by Joe West (Dkt. 13-2, at 2).

4        **2.  Fourth Amendment Claim for Excessive Force Against Officers Bakala, Hovda, and**

5        **Gassett**

6        *A.  Civil Rights Claim.*  In order to state a claim under 42 U.S.C. § 1983, a complaint must

7    allege that (1) the conduct complained of was committed by a person acting under color of state law, and

8    that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

9    laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds,*

10   *Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to remedy an alleged

11   wrong only if both of these elements are present.  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir.

12   1985), *cert. denied*, 478 U.S. 1020 (1986).

13       *B.  Qualified Immunity.*  Defendants in a Section 1983 action are entitled to qualified

14   immunity from damages for civil liability if their conduct does not violate clearly established

15   statutory or constitutional rights of which a reasonable person would have known.  *Pearson v.*

16   *Callahan*, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

17   Qualified immunity balances two important interests: the need to hold public officials accountable

18   when they exercise power irresponsibly and the need to shield officials from harassment, distraction,

19   and liability when they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The

20   existence of qualified immunity generally turns on the objective reasonableness of the actions,

21   without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a

22   reasonable officer could have believed his or her conduct was proper is a question of law for the

23   court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v.*

24   *Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

25       In analyzing a qualified immunity defense, the Court must determine: (1) whether a

26   constitutional right would have been violated on the facts alleged, taken in the light most favorable to

27   the party asserting the injury; and (2) whether the right was clearly established when viewed in the

28   specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The relevant dispositive

ORDER
Page - 13

inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* While the sequence set forth in *Saucier* is often appropriate, it should no longer be regarded as mandatory. *Pearson v. Callahan*, at 129 S.Ct at 811. "The judges of ... the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Saucier v. Katz*, 121 S.Ct. at 2156.

An officer using deadly force is entitled to qualified immunity, unless the law was clearly established that the use of force violated the Fourth Amendment. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

     *C. Fourth Amendment Prohibition on Excessive Use of Force.* The first question addressed in this qualified immunity analysis is whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to plaintiff.

The use of potentially deadly force implicates the Fourth Amendment protections that guarantee citizens the right to be secure in their persons against unreasonable seizures of the person. *Tennessee v. Garner*, 471 U.S. 1 (1985). The reasonableness of the force used to effect a particular seizure is determined by carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). *See also Scott v. Harris*, 550 U.S. 372, 383 (2007)("In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *quoting United States v. Place*, 462 U.S. 696, 703 (1983). The force that is applied must be balanced against the need for that force. *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997).

In determining the reasonableness of officers' actions, the court (1) assesses the severity of the intrusion on the individual's Fourth Amendment rights by considering the type and amount of

force inflicted; (2) analyzes the government's interests by considering the severity of the crime, whether the suspect posed an immediate threat to the officers' or public's safety, and whether the suspect was resisting arrest or attempting to escape; and (3) balances the gravity of the intrusion on the individual against the government's need for that intrusion. *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010); *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The totality of the circumstances of each case must be considered. *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995); *Forrester v. City of San Diego*, 25 F.3d at 806, n. 2.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. at 396. In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. *Id.* at 397. A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable. *Scott v. Henrich*, 39 F.3d 912, 915(9th Cir.1994).

   *D. Discussion.*

   *Stop at the Shell Station*. Officers Bakala, Gassett, and Hovda responded to a shooting at 12:30 a.m. Witnesses reported that the driver of a black Del Sol, a male with dark, or darker, skin, shot the victim. The state registry listed 109 Del Sol automobiles registered in the state; two were registered in Olympia. At 5:45 a.m., these officers saw a black Del Sol at the Shell station, a few blocks from where the earlier shooting had occurred. Officer Hovda stated that the driver was a male with slightly darker skin, and that the driver appeared to be very nervous about why Officer Hovda was there. The driver kept looking over his shoulder at Officer Hovda. Officers Bakala and Hovda entered the Shell station lot; and Officer Bakala started to say something or was going to say something when the car took off. At that point, Officer Bakala had drawn his weapon but the weapon was kept low, behind the door of Officer Bakala's vehicle. Officer Bakala stated that the Del Sol took off at a high rate of speed onto Pacific Avenue. Officer Gassett saw the Del Sol take off from the

1   Shell station and spin out coming onto Pacific. Officer Gassett moved in behind the Del Sol with his

2   overhead lights and siren activated.

3          Plaintiff contends that the officers did not have reasonable suspicion to stop the Del Sol at the

4   Shell station.

5          The officers entered the area of the Shell station parking lot. It is questionable whether the

6   officers stopped the driver of the Del Sol.  At the most, Officers Bakala and Hovda drove into the

7   Shell station lot, and Officer Bakala started to say something to the driver of the Del Sol. The

8   intrusion, at that point, was minimal.

9          The court next looks at the nature of the government interests involved.  If the police have a

10   reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was

11   involved in or is wanted in connection with a completed felony, a *Terry* stop may be made to

12   investigate that suspicion.  *United States v. Hensley*, 469 U.S. 221, 229 (1985)(citing *Terry v. Ohio*,

13   392 U.S.1 (1968)). Here, the Del Sol matched the description of the car from which the shot had been

14   fired in the 12:30 a.m. incident, a little over four hours before a black Del Sol was located at the Shell

15   station, just blocks away from where the earlier shooting occurred.  There were only 109 Del Sol

16   automobiles registered in the State.  The driver was nervous when he saw officers Bakala and Hovda.

17   The officers noticed that the driver had slightly darker skin.

18          Under the circumstances, given the minimal nature of the intrusion and the strong government

19   interests involved, Officers Bakala and Hovda acted in an objectively reasonable manner when they

20   drove into the Shell parking lot and attempted to contact the driver.

21          *High Speed Chase.*  The Del Sol took off from the Shell parking lot at a high rate of speed.

22   Officer Gassett moved in behind the Del Sol, with his flashing lights. The nature of the intrusion,

23   pursuit of a vehicle by use of flashing lights in an attempt to stop the Del Sol, was minimal.  The

24   government interests were significant, considering that Officer Gassett knew of the 12:30 a.m.

25   shooting, the Del Sol at the Shell station matched the car involved in the earlier shooting, and the Del

26   Sol took off at a high rate of speed onto a city street. Officer Gassett acted in an objectively

27   reasonable manner in pursuing an automobile going at a high rate of speed, by flashing his lights.

28          The Del Sol led Officers Bakala, Gassett, and Hovda on a high speed pursuit.  The officers

1   acted reasonably, and in the interest of public safety, in attempting to stop a driver who was driving

2   in a manner that could endanger the public.

3          *Scene of the Shooting.*  Deadly force was used against the driver of the Del Sol.  This is the

4   highest level of intrusion.

5          The court next analyzes the government interests involved.  At the scene of the shooting,

6   Officers Bakala, Gassett, and Hovda got out of their vehicles and ordered the driver to stay in his car,

7   turn the car off, and put his hands in sight.  The driver was yelling and jerking, and asked "What did I

8   do?"  The officers kept asking the driver to show his hands; the driver did not comply.  The driver

9   then reached over toward the console, repeatedly.  The officers, who were aware of the 12:45 a.m.

10  shooting, were concerned that the driver was trying to reach for a gun.  The female passenger told the

11  driver to stop.  The officers believed that the passenger was trying to tell the driver to stop reaching

12  for the gun.  Even then, the officers did not shoot.

13         The driver then started backing up.  Officer Gassett shot at the driver's front tire to try to get

14  the car to stop.  The driver continued to try to free himself by backing up.  Officer Hovda was

15  unprotected, and at risk of being hit by the car being accelerated in reverse.  Officer Bakala and a

16  Lacy police officer were in the line of the car accelerating in reverse.  All of the officers were at risk

17  if the driver retrieved a gun and shot at them.

18         Plaintiff contends that it was not reasonable for the officers to think that they were at risk

19  from the driver accelerating into them in reverse, because the driver's car was stuck.  Officer Gassett

20  testified that "Hovda's got no protection at all except that this car at this point can't get up over this

21  curb.  And the angle he's in, I don't know if he could, I mean, a trained driver could, but I don't

22  know."  Dkt. 26, Exh. C, at 106.  Officer Gassett's speculation about whether the driver could have

23  maneuvered the car away from the curb and into Officers Bakala and Hovda (and the Lacy police

24  officer) is not sufficient to cast doubt on the reasonable fear that the driver could, and was intending

25  to, pop away from the curb and accelerate into the officers.

26         Plaintiff argues that the officers should have permitted the Lacey police officer to use his stop

27  sticks before they fired.  However, Lacey Police Officer Sapinoso was returning from his patrol car

28  with the stop sticks when the shots were fired.  There is no indication that he could have used the

1   stop sticks before the shots were fired, or that the stop sticks would have changed anything.

2        Plaintiff contends that the officers were reckless in positioning themselves behind and to the

3   side of the Del Sol, so that they were at greater risk of being run into; and that Officers Hovda and

4   Bakala deliberately remained there, even after they apparently believed that they were in imminent

5   danger of being hit by the Del Sol.  Officer Hovda testified that he had no way out–he was pinned by

6   the Del Sol and the fence. The other officers were in positions to try to stop and apprehend the driver.

7   It does not make sense to suggest that the officers should take themselves out of a position to stop the

8   driver/car so that the car could get away.

9        Plaintiff argues that Mr. Jiminez did not physically resist the officers.  The officers believed

10   that Mr. Jimenez had been involved in the 12:30 a.m. shooting; that he had a gun in the car; that he

11   refused to comply with the officers' requests to show his hands; and that he continued to reach with

12   his left hand toward the console.  Plaintiff's contention that he did not physically resist the officers is

13   unsupported by the record.

14        A review of the facts and circumstances shows that the government interests in safety of the

15   officers and safety of the public were exceedingly high.

16        Finally, the court balances the nature of the intrusion against the government interests.

17   Officers Bakala, Gassett, and Hovda shot and killed the driver. Under the circumstances, it was

18   reasonable for these officers to use deadly force to stop the driver from retrieving a gun from the

19   console and shooting them, and to stop the driver from using his car to accelerate in reverse into the

20   officers, with the possibility of seriously injuring or killing them.

21        It is easy, in retrospect, to take the scene apart and analyze it frame by frame. However, the

22   events at the scene of the shooting took place over a short period of time, and several things appeared

23   to be happening at once. Throughout the incident, the officers believed that their personal safety was

24   at risk while they were trying to protect the public from a person they believed had been involved in a

25   shooting.  Based upon the totality of the circumstances, the officers' action in shooting Mr. Jiminez

26   was reasonable.  Officers Bakala, Gassett, and Hovda did not violate Mr. Jiminez' rights under the

27   Fourth Amendment to be free from unreasonable seizure and use of deadly force.

28        Because Mr. Jiminez' Fourth Amendment rights were not violated, it is not necessary to

address whether those rights were clearly established.  However, it is worth noting that the Supreme Court has set forth the clearly established law on use of deadly force.  Although it is clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others, it is not constitutionally unreasonable to prevent escape using deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In this case, under all the circumstances, the officers had probable cause to believe that the driver of the automobile posed a threat of serious physical harm when they reasonably believed that their lives were in danger.

Officers Bakala, Gassett, and Hovda are entitled to qualified immunity on plaintiff's claim of excessive force under the Fourth Amendment.

### 3. Fifth and Fourteenth Amendment Due Process Claim

Defendants claim that plaintiff has not stated a claim under the Fourteenth Amendment because such a claim must be analyzed under the appropriate standard for the Fourth Amendment, and is not cognizable as a separate claim. *See United States v. Lanier*, 520 U.S. 259, 272, n. 7 (1997)(*Graham v. Connor* requires that if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under substantive due process).  Plaintiff concedes that she is not making a substantive due process claim.  *See* Dkt. 25, at 16.  Further, plaintiff does not maintain that she is making a procedural due process claim.  The claims under the Fifth and Fourteenth Amendments should be dismissed.

### 4. Municipal Liability Against the City of Olympia for Federal Constitutional Claims

Defendants contend that plaintiff has not shown the elements for a claim of municipal liability against the City of Olympia.

In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct.  *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978); *Larez v.*

*City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991).  The municipal action must be the moving force behind the injury of which plaintiff complains.  *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).  *See Jackson v. City of Bremerton*, 268 F.3d at 653 (Neither a municipality nor a supervisor can be held liable under § 1983 where no injury or constitutional violation has occurred).

In this case, Officers Bakala, Gassett, and Hovda did not commit a constitutional violation against Mr. Jimenez.  Accordingly, there can be no municipal liability.

The court will, however, address the argument made by plaintiff.  Plaintiff argues that the City of Olympia has a policy that directs/authorizes its police officers to use more force than those with whom the officers interact.  Officer Gassett testified at his deposition that "This was a lethal force situation. I'm not going to use something less than lethal force."  Dkt. 26, Exh. C, at 120. When asked whether he would use deadly force if there were a threat of serious physical harm or death to him or to others, instead of using a taser, Office Hovda testified at his deposition that "I'm not going to take a stick to a gun fight if I can help it"; "[g]enerally speaking, I'm going to use a force that is above what they're using so that I can take control of it"; "I'm going to try to use a force that is greater than theirs to overcome their force".  Dkt. 26, Exh. C, at 15(Pages 54 to 57) and 58. Plaintiff's argument is without merit.  Plaintiff appears to suggest that officers can only constitutionally use less force than that presented to them in the situation they encounter, or force equal to that presented to them.  In other words, plaintiff is suggesting that the officers can use only enough force to make it a fair fight.  That is not the standard.

Plaintiff has not shown that the City of Olympia has a policy authorizing use of excessive force.  Moreover, plaintiff has not shown that the City of Olympia authorizes its officers to use excessive force, even if officers are authorized to use deadly force to counter situations where they are threatened by deadly force.  The Fourth Amendment claim against the City of Olympia should be dismissed.

### 5. State Law Claims

Plaintiff has alleged state law claims for battery and negligence.  Defendants contend that the state law claims for battery against officers Bakala, Hovda, and Gassett should be dismissed because

ORDER
Page - 20

1    there was no excessive force; and that the evidence does not support a claim for negligence against

2    officers Bakala, Hovda, and Gassett.

3           Under 28 U.S.C. § 1367, a federal court may assume supplemental jurisdiction over all other

4    claims that are so related to claims in the action within the original jurisdiction so that they form part

5    of the same case or controversy.

6           *A. Battery.*  A battery is the intentional infliction of a harmful bodily contact upon another;

7    and in order that any act may be done with the intention of bringing about a harmful contact or an

8    apprehension thereof to a particular person, the act must be done for the purpose of causing the

9    contact or apprehension or with knowledge on the part of the actor that it is substantially certain to be

10   produced.  *See Garratt v. Dailey*, 56 Wn.2d 197, 200 (1955).  Only when an officer uses excessive

11   force may a claim be made for battery against the officer.  *McKinney v. Tukwila*, 103 Wn.App. 391,

12   408-09 (2000); *Staats v. Brown*, 139 Wn.2d 757, 780 (2000).

13          As discussed above, plaintiff has not shown that there are issues of fact as to whether the

14   Olympia Police Officers used excessive force against Mr. Jimenez. Accordingly, the claim for battery

15   against Officers Bakala, Gassett, and Hovda should be dismissed.

16          *B. Negligence*.  In an action for negligence a plaintiff must prove four basic elements: (1) the

17   existence of a duty; (2) breach of that duty; (3) resulting injury; and (4) proximate cause.  *Degel v.*

18   *Majestic Mobile Manor, Inc*., 129 W.2d 43, 48 (1996).

19          In negligence actions against government entities and their employees, Washington courts

20   follow the public duty doctrine.  To be actionable, the duty must be one owed to the injured plaintiff

21   specifically, not simply one owed to the public in general.  *Cummins v. Lewis County*, 156

22   Wn.2d 844, 852 (20006).  There are four exceptions to the public duty doctrine: (1) where there is

23   legislative intent to impose a duty of care; (2) where a special relationship exists between the plaintiff

24   and the public entity; (3) where the government has engaged in volunteer rescue efforts; or (4) where

25   there is a failure to enforce a specific statute.  *Babcock v. Mason County Fire District No. 6*, 144

26   Wn.2d 774, 785-86 (2001).

27          Plaintiff maintains that the legislature intended to protect individuals from use of unnecessary

28   deadly force by police officers.  Plaintiff argues that police officers may be found guilty of

Manslaughter in the Second Degree, RCW 9A.32.070; that homicide or use of deadly force is justifiable when necessarily used by a peace officer to arrest or apprehend a person who the officer reasonably believes has committed, has attempted to commit, is committing, or is attempting to commit a felony (RCW 9A.16.040(c)(c)); that the necessity of use of deadly force turns on whether the peace officer has probable cause to believe that the suspect, if not apprehended, poses a threat of serious physical harm to the officer or a threat of serious physical harm to others (RCW 9A.16.040(2); and that a police officer shall not be held criminally liable for using deadly force without malice and with a good faith belief that such act is justified (RCW 9A.16.040(3). Plaintiff argues that the public duty doctrine does not apply because the legislature clearly intended individuals to have a cause of action, based upon use of excessive force in attempting to arrest a suspect. However, the language of the statute does not exhibit clear legislative intent to identify and protect a particular and circumscribed class of persons. *Honcoop v. State*, 111 Wn.2d 182, 188 (1988); *Hannum v. Washington State Dept. of Licensing*, 144 Wn.App. 354, 360 (2008). It appears that the public duty doctrine bars a claim against Officers Bakala, Gassett, and Hovda; and the City of Olympia.

Even if the public duty doctrine does not apply, and even if plaintiff has a cause of action for negligence against Officers Bakala, Gassett, Hovda, and the City of Olympia, there are no issues of fact that preclude summary judgment on this claim. As discussed above, Officers Bakala, Gassett, and Hovda did not use excessive force against Mr. Jimenez. Therefore, they did not breach a duty to Mr. Jimenez. There is no basis for holding the City of Olympia liable on the negligence claim. This claim should be dismissed.

### 6. Claims against Officers Aalbers and Sapinoso and the City of Lacey

Defendants request that the claims against Officers Aalbers and Sapinoso, and against the City of Lacey be dismissed with prejudice. Plaintiff contends that there are issues of fact as to whether Officers Aalbers and Sapinoso had a realistic opportunity to intervene to prevent the harm from occurring; plaintiff requests that the court dismiss the claims against these defendants under Fed.R.Civ.P. 41(a). Unless the court order states otherwise, a dismissal under Fed.R.Civ.P. 41(a) is without prejudice.

1    There is nothing in the record that would support a claim that Officers Aalbers and Sapinoso

2    had a realistic opportunity to intervene to prevent the use of deadly force against the driver of the Del

3    Sol by Officers Bakala, Gassett, and Hovda.  Moreover, because Officers Bakala, Gassett, and Hovda

4    did not use unreasonable force in shooting the driver of the Del Sol, plaintiff has not shown that

5    Officers Aalbers and Sapinoso should have intervened to prevent the use of deadly force.  Further,

6    there is no showing of municipal liability for the City of Lacey.  The claims against Officers Aalbers

7    and Sapinoso and against the City of Lacey should be dismissed with prejudice.

8    Therefore, it is hereby

9    **ORDERED** that Plaintiff's Motion to Strike (Dkt. 26) is **GRANTED IN PART AND**

10   **DENIED IN PART** as discussed above.  Defendants' Motion for Summary Judgment (Dkt. 12) is

11   **GRANTED**.  All claims against all defendants are **DISMISSED WITH PREJUDICE**.

12   The Clerk is directed to send uncertified copies of this Order to all counsel of record and to

13   any party appearing *pro se* at said party's last known address.

14   DATED this 2nd day of August, 2010.

15

16   Robert J. Bryan
     United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

ORDER
Page - 23